**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MODOC LASSEN INDIAN HOUSING
AUTHORITY, the tribally designated
housing entity for the Grindstone Indian
Rancheria of Wintun-Wailaki Indians of
California,

     Plaintiff - Appellee,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, General Deputy Assistant
Secretary for Public and Indian Housing;
GLENDA GREEN, Director, Office of
Grants Management, Office of Native
American Programs,

     Defendants - Appellants.

_____

TLINGIT-HAIDA REGIONAL
HOUSING AUTHORITY,

     Plaintiff - Appellee,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban

No. 14-1313

No. 14-1331

Development; DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public and Indian Housing; GLENDA GREEN, Director, Office of Grants Management, Office of Native American Programs,

Defendants - Appellants.

_____

CHOCTAW NATION OF OKLAHOMA; HOUSING AUTHORITY OF THE CHOCTAW NATION OF OKLAHOMA,

Plaintiffs - Appellants,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BEN CARSON, Secretary of Housing and Urban Development; DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public and Indian Housing; GLENDA GREEN, Director, Office of Grants Management, Office of Native American Programs,

Defendants - Appellees.

_____

NAVAJO HOUSING AUTHORITY,

Plaintiff - Appellee,

v.

UNITED STATES DEPARTMENT OF

Nos. 14-1338 & 14-1340

No. 14-1343

2

HOUSING AND URBAN DEVELOPMENT; BEN CARSON, Secretary of Housing and Urban Development; DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public and Indian Housing, GLENDA GREEN, Director, Office of Grants Management, Office of Native American Programs.

       Defendants - Appellants.

_____

FORT PECK HOUSING AUTHORITY,

       Plaintiff - Appellee,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BEN CARSON, Secretary of Housing and Urban Development; JEMINE A. BRYON, Acting Assistant Secretary for Public and Indian Housing,

       Defendants - Appellants.

_____

SICANGU WICOTI AWANYAKAPI CORPORATION; OGLALA SIOUX (LAKOTA) HOUSING; TURTLE MOUNTAIN HOUSING AUTHORITY; WINNEBAGO HOUSING AND DEVELOPMENT COMMISSION; LOWER BRULE HOUSING AUTHORITY; SPIRIT LAKE HOUSING CORPORATION; TRENTON INDIAN HOUSING AUTHORITY,

No. 14-1407

Plaintiffs - Appellees,

v.                                                    No. 14-1484

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, General Deputy Assistant
Secretary for Public and Indian Housing;
GLENDA GREEN, Director, Office of
Grants Management, Office of Native
American Programs,

Defendants - Appellants.

_____

BLACKFEET HOUSING; THE ZUNI
TRIBE; ISLETA PUEBLO HOUSING
AUTHORITY; PUEBLO OF ACOMA
HOUSING AUTHORITY;
ASSOCIATION OF VILLAGE COUNCIL
PRESIDENTS REGIONAL HOUSING
AUTHORITY; NORTHWEST INUPIAT
HOUSING AUTHORITY; BRISTOL
BAY HOUSING AUTHORITY;
ALEUTIAN HOUSING AUTHORITY;
CHIPPEWA CREE HOUSING
AUTHORITY; BIG PINE PAIUTE
TRIBE,

Plaintiffs - Appellees,

v.                                                    No. 15-1060

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, Assistant Secretary for

4

Public and Indian Housing; GLENDA
GREEN, HUD's Office of Grants
Management, National Office of Native
American Programs, Department of
Housing and Urban Development, Office
of Public and Indian Housing,

     Defendants - Appellants.

_____

**ORDER**
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

These matters are before the court on the *Petition for Rehearing or Rehearing En Banc* filed by Appellees in numbers 14-1407 and 15-1060 and the *Petition for Rehearing En Banc* filed by Appellees in numbers 14-1313, 14-1331, 14-1338, 14-1340, and 14-1484.

Upon consideration and in light of the parties' post-opinion factual stipulation that HUD has already repaid the Tribes, the panel grants in part the request for panel rehearing in numbers 14-1407 and 15-1060, but only to the extent of the modifications contained in the attached revised Opinion. Judge Matheson would grant panel rehearing in full on the sovereign immunity issue in numbers 14-1407 and 15-1060. The Opinion and separate writings filed on July 25, 2017, are hereby withdrawn, and shall be replaced by the attached revised Opinion and separate writings. The Clerk is directed to file the revised Opinion and separate writings effective the date of this order.

The revised Opinion and separate writings, the *Petition for Rehearing or Rehearing En Banc* filed by Appellees in numbers 14-1407 and 15-1060, and the *Petition*

*for Rehearing En Banc* filed by Appellees in numbers 14-1313, 14-1331, 14-1338, 14-1340, and 14-1484 were circulated to all of the judges of the court who are in regular active service. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the requests for *en banc* rehearing are denied pursuant to Fed. R. App. P. 35.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MODOC LASSEN INDIAN HOUSING
AUTHORITY, the tribally designated
housing entity for the Grindstone Indian
Rancheria of Wintun-Wailaki Indians of
California,

     Plaintiff - Appellee,

v.                                                                         No. 14-1313

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development;[*] DEBORAH A.
HERNANDEZ, General Deputy Assistant
Secretary for Public and Indian Housing;
GLENDA GREEN, Director, Office of
Grants Management, Office of Native
American Programs,

     Defendants - Appellants.

_____

TLINGIT-HAIDA REGIONAL
HOUSING AUTHORITY,

     Plaintiff - Appellee,

v.                                                                         No. 14-1331

_____

    [*] In each appeal, we substitute Ben Carson, Secretary of Housing and Urban
Development, in place of his predecessor, Julian Castro. *See* Fed. R. App. P.
43(c)(2).

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BEN CARSON, Secretary of Housing and Urban Development; DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public and Indian Housing; GLENDA GREEN, Director, Office of Grants Management, Office of Native American Programs,

      Defendants - Appellants.

_____

CHOCTAW NATION OF OKLAHOMA; HOUSING AUTHORITY OF THE CHOCTAW NATION OF OKLAHOMA,

      Plaintiffs - Appellants,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BEN CARSON, Secretary of Housing and Urban Development; DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public and Indian Housing; GLENDA GREEN, Director, Office of Grants Management, Office of Native American Programs,

      Defendants - Appellees.

_____

NAVAJO HOUSING AUTHORITY,

Nos. 14-1338 & 14-1340

2

Plaintiff - Appellee,

v.                                    No. 14-1343

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, General Deputy Assistant
Secretary for Public and Indian Housing,
GLENDA GREEN, Director, Office of
Grants Management, Office of Native
American Programs.

　　　Defendants - Appellants.

_____

FORT PECK HOUSING AUTHORITY,

　　　Plaintiff - Appellee,

v.                                    No. 14-1407

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; JEMINE A. BRYON,
Acting Assistant Secretary for Public and
Indian Housing,

　　　Defendants - Appellants.

_____

SICANGU WICOTI AWANYAKAPI
CORPORATION; OGLALA SIOUX
(LAKOTA) HOUSING; TURTLE
MOUNTAIN HOUSING AUTHORITY;
WINNEBAGO HOUSING AND
DEVELOPMENT COMMISSION;

3

LOWER BRULE HOUSING
AUTHORITY; SPIRIT LAKE HOUSING
CORPORATION; TRENTON INDIAN
HOUSING AUTHORITY,

      Plaintiffs - Appellees,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, General Deputy Assistant
Secretary for Public and Indian Housing;
GLENDA GREEN, Director, Office of
Grants Management, Office of Native
American Programs,

      Defendants - Appellants.

_____

BLACKFEET HOUSING; THE ZUNI
TRIBE; ISLETA PUEBLO HOUSING
AUTHORITY; PUEBLO OF ACOMA
HOUSING AUTHORITY;
ASSOCIATION OF VILLAGE COUNCIL
PRESIDENTS REGIONAL HOUSING
AUTHORITY; NORTHWEST INUPIAT
HOUSING AUTHORITY; BRISTOL
BAY HOUSING AUTHORITY;
ALEUTIAN HOUSING AUTHORITY;
CHIPPEWA CREE HOUSING
AUTHORITY; BIG PINE PAIUTE
TRIBE,

      Plaintiffs - Appellees,

v.

UNITED STATES DEPARTMENT OF

No. 14-1484

No. 15-1060

4

HOUSING AND URBAN
DEVELOPMENT; BEN CARSON,
Secretary of Housing and Urban
Development; DEBORAH A.
HERNANDEZ, Assistant Secretary for
Public and Indian Housing; GLENDA
GREEN, HUD's Office of Grants
Management, National Office of Native
American Programs, Department of
Housing and Urban Development, Office
of Public and Indian Housing,

      Defendants - Appellants.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. Nos. 05-CV-0018-RPM, 08-CV-0451-RPM, 08-CV-0826-RPM,
08-CV-2573-RPM, 08-CV-2577-RPM, 08-CV-2584-RPM, and
07-CV-1343-RPM)**

_____

Gerard Sinzdak, Attorney, Appellate Staff, United States Department of Justice, Civil Division, Washington, D.C. (Benjamin C. Mizer, Principal Deputy Assistant Attorney General, John F. Walsh, United States Attorney, and Michael S. Raab, Attorney, Appellate Staff, United States Department of Justice, Civil Division, Washington, D.C., with him on the briefs), for Defendants-Appellants.

Craig H. Kaufman, Quarles & Brady, LLP, Tucson, Arizona, Jonathan K. Tillinghast, Simpson, Tillinghast, Sorensen & Sheehan, Juneau, Alaska, and John Fredericks, III, Fredericks Peebles & Morgan LLP, Mandan, North Dakota (David J. Rapport, Rapport and Marston Law Offices, Ukiah, California; Louis W. Bullock and Patricia Whittaker Bullock, Bullock Law Firm, Tulsa, Oklahoma; J. Frank Wolf, III, Rabon Wolf & Rabon, Hugo, Oklahoma; David V. Heisterkamp, II, Amber Leigh Hunter, and James F. Wagenlander, Wagenlander & Heisterkamp, Denver, Colorado; Blain David Myhre, Blain Myhre LLC, Englewood, Colorado; Peter J. Breuer, Fredericks Peebles & Morgan LLP, Louisville, Colorado, with them on the brief), for Plaintiffs-Appellees.

_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

These consolidated appeals arise from a government agency's decision to recapture, via administrative offset, funds that the agency allegedly overpaid to multiple grant recipients. The grant recipients brought suit in federal court, arguing in relevant part that the agency lacked authority to recapture the funds without first providing them with administrative hearings. The district court agreed and ordered the agency to repay the grant recipients. The agency now appeals that order.[1]

If these underlying facts sound relatively straightforward, it's because they are. But they nevertheless give rise to three legal questions that are decidedly less so: (1) did the agency recapture the funds pursuant to a statute or regulation that imposed a hearing requirement, thus rendering the recaptures illegal; (2) if the agency didn't recapture the funds pursuant to such a statute or regulation, did it have authority to recapture the alleged overpayments at all; and (3) if not, could the district court order the agency to reimburse the grant recipients for the amounts it illegally collected?

In answering the first of these three questions, the panel unanimously agrees that the agency didn't recapture the funds pursuant to a statute or regulation that imposes a hearing requirement. Thus, we agree that the district court erred in ruling that the recipients were entitled to hearings before the agency could recapture the alleged overpayments.

---

[1] In resolving the parties' various arguments, the district court actually entered several separate orders. For simplicity, we treat them as a single order and refer to them as such.

6

But that's where our unanimous agreement ends; the remaining questions divide the panel. Ultimately, two members of the panel agree that the agency lacked authority to recapture the funds via administrative offset. Accordingly, we affirm the portion of the district court's order that characterizes the recaptures as illegal. Nevertheless, two other members of the panel agree that under the doctrine of sovereign immunity, the district court lacked authority to order the agency to repay the recipients to the extent the agency had already redistributed or otherwise expended the recaptured funds. Thus, we reverse that portion of the district court's order and remand for further factual findings.

**I**

Congress enacted the Native American Housing Assistance and Self–Determination Act (NAHASDA) of 1996, 25 U.S.C. §§ 4101-4243, to help Indian tribes provide affordable housing for their members, *see* 25 U.S.C. § 4101(5). To that end, the United States Department of Housing and Urban Development (HUD) allocates NAHASDA grant funds among recipient tribes each year.

In determining how to allocate those funds, HUD employs a regulatory formula that takes into account each tribe's Formula Current Assisted Stock (FCAS)—a figure calculated by multiplying the number of eligible low-rent housing units in that tribe's possession by a fixed dollar amount. *See* 25 U.S.C. § 4152(a)(1); 24 C.F.R. §§ 1000.310(a), 1000.316. Critically, HUD relies on each tribe to provide an accurate yearly count of its eligible housing units. *See* 24 C.F.R. §§ 1000.315(a), 1000.319(a). And because HUD allocates funds to all tribes from a finite yearly pool,

7

*see* 25 U.S.C. § 4151, a tribe that erroneously reports an inflated number of eligible housing units will not only receive an overpayment, but will necessarily reduce the funds available to other eligible tribes. *See Fort Belknap Hous. Dep't v. Office of Pub. & Indian Hous.*, 726 F.3d 1099, 1100 n.2 (9th Cir. 2013) ("Because the total amount of money available to all tribes is fixed, [NAHASDA funding] is a zero-sum game: Any change in one tribe's allocation requires an offsetting change to other tribes' allocations.").

Appellees are various tribes (the Tribes) that allegedly inflated their eligible-unit counts—and therefore allegedly received overpayments—during various years.[2] When HUD discovered these alleged overpayments, it recouped the funds by deducting them from the Tribes' subsequent yearly NAHASDA allocations. The Tribes then sued for the return of those funds.

In relevant part, the Tribes argued that HUD lacked authority to recapture the funds without first providing the Tribes with administrative hearings. The district court agreed. As a result, the court ordered HUD to restore the recaptured funds to the Tribes.[3] HUD now appeals.

---

[2] More specifically, the appellees are the Tribes' housing authorities. For purposes of these appeals, we treat each tribe and its housing authority as interchangeable.

[3] Although neither the Tribes nor HUD assert as much in their initial briefs, they both maintain in post-opinion briefing that HUD has already complied with this order by repaying the Tribes. But even in their post-opinion briefing, neither the Tribes nor HUD provide us with any citations to the record that might support this factual assertion. True, the Tribes provide record citations that demonstrate the district court ordered HUD to repay the Tribes. But none of those citations

## II

Because these appeals arise under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, "[w]e take 'an independent review of [HUD's] action' and are not bound by the district court's factual findings or legal conclusions." *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1188 (10th Cir. 2006) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1569 n.16 (10th Cir. 1994)). We will "set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

On appeal, HUD advances three challenges to the district court's ruling that HUD acted illegally by recapturing the funds without conducting administrative hearings. First, HUD asserts that it wasn't required to hold hearings before it recaptured the funds because the only statutes and regulations that might require hearings don't apply here. Second, HUD insists that in the absence of an applicable

---

demonstrate that HUD *actually complied* with the court's order. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the . . . parts of the record on which the appellant relies"); Fed. R. App. P. 28(b) (requiring appellee's brief to "conform to the requirements of" Fed. R. App. P. 28(a)(8)).

Nevertheless, despite the parties' failure to comply with Rule 28's requirements, we accept their joint factual stipulation on this point. *Cf. Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1078 n.3 (10th Cir. 2009) (noting that "we will honor stipulations to evidentiary facts"). Finally, we note that neither party suggests this procedural fact calls into question HUD's ability to appeal the district court's order. On the contrary, HUD asserts in post-petition briefing that it specifically informed the Tribes that it was reserving its right to appeal despite its compliance with the district court's order. And although HUD doesn't provide a record citation to support this factual assertion, the Tribes have never suggested that HUD's compliance with the district court's order implicates its right to appeal.

9

statute or regulation, it was instead empowered to recapture the alleged overpayments via administrative offset under the common-law doctrine of payment by mistake. Third, HUD states that even if it lacked common-law authority to recapture the alleged overpayments via administrative offset, the district court nevertheless erred in ordering HUD to return the alleged overpayments to the Tribes because—with one exception—such an order amounts to an award of "money damages" and therefore runs afoul of 5 U.S.C. § 702.[4]

**A**

In concluding that the Tribes were entitled to hearings before HUD could recapture the alleged overpayments, the district court relied on the relevant versions of 24 C.F.R. § 1000.532 and 25 U.S.C. § 4161(a)(1). HUD doesn't dispute that these provisions required it to provide administrative hearings under certain circumstances. Instead, HUD argues that those circumstances simply aren't present here. For the reasons discussed below, we agree. And because these provisions therefore don't apply to HUD's recapture of the alleged overpayments, neither do their hearing requirements.

**i**

---

[4] HUD also argues that it didn't act arbitrarily and capriciously in concluding that the Tribes misreported the number of eligible housing units in their possession. But even assuming HUD is correct on this point, we conclude that HUD nevertheless lacked authority to recapture the alleged overpayments. Accordingly, we need not address this argument.

10

Under 24 C.F.R. § 1000.532 (1998), HUD had authority to "make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with . . . findings" that HUD made "pursuant to reviews and audits under [25 U.S.C. § 4165]." 24 C.F.R. § 1000.532(a) (1998). But before doing so, HUD had to first provide "a hearing in accordance with [24 C.F.R.] § 1000.540."[5] 24 C.F.R. § 1000.532(b) (1998). Thus, the threshold question before us is whether HUD recaptured the alleged overpayments based on findings it made "pursuant to reviews and audits under [§ 4165]"; if so, then the Tribes were entitled to "a hearing in accordance with [24 C.F.R.] § 1000.540." 24 C.F.R. § 1000.532(a), (b) (1998).

The relevant versions of § 4165 required HUD to undertake "such reviews and audits as may be necessary or appropriate" to make three specific determinations: (1) whether each tribe "carried out its eligible activities in a timely manner, . . . carried out its eligible activities and certifications in accordance with the requirements and the primary objectives of this chapter and with other applicable laws, and has a continuing capacity to carry out those activities in a timely manner"; (2) whether each tribe "complied with [its] Indian housing plan"; and (3) whether each tribe's "performance reports . . . [were] accurate." § 4165(a) (1998); *see* § 4165(b) (2006).

---

[5] More specifically, a "recipient [could] request . . . a hearing in accordance with § 1000.540" if the dispute was "not resolved" via an "informal meeting." 24 C.F.R. § 1000.532(b) (1998). Because neither party suggests that the matter of the alleged overpayments was "resolved" via an "informal meeting" or that the Tribes didn't request hearings, *id.*, we don't address those possibilities.

Both the Ninth Circuit and the Court of Federal Claims have held that when HUD reviews a tribe's report of its eligible housing stock, that review falls within the scope of the first of these three categories, i.e., within HUD's authority to review a tribe's activities and certifications. *See Crow Tribal Hous. Auth. v. Dep't of Hous. & Urban Dev.*, 781 F.3d 1095, 1103 (9th Cir. 2015) ("[W]e conclude HUD's . . . FCAS review constituted an audit within the meaning of § 4165 to determine whether the Tribe had carried out 'eligible activities and certification in accordance with this chapter and other applicable law.'" (quoting § 4165(b)(1)(A)(i)(II))); *Lummi Tribe of Lummi Reservation v. United States*, 106 Fed. Cl. 623, 630 (2012) ("Such a review, we believe, comes within [§ 4165's] broad mandate to ensure that the grant program is being conducted in accordance with NAHASDA." (citing § 4165(b)(1)(A)(i)(II))).

But as HUD points out, *Crow* doesn't acknowledge that "eligible activities" and "certifications" are defined terms—let alone discuss whether, as defined, those terms encompass a tribe's report of its eligible housing stock. Instead, in concluding that HUD's review of a tribe's reported eligible housing units constitutes a review or audit for purposes of § 4165, *Crow* explicitly states that (1) "NAHASDA does not define 'eligible activities and certification,'" and (2) "it is ambiguous whether the term encompasses" such reviews. 781 F.3d at 1103 (quoting § 4165(b)(1)(A)(i)(II)). *Crow* then resolves this alleged ambiguity by applying the Indian canon, which states that "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.* (alteration in original) (quoting *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269

12

(1992)). Likewise, *Lummi* concludes that HUD's review of a tribe's eligible housing units falls within HUD's authority to determine whether that tribe has carried out eligible activities without ever addressing what those eligible activities might be. *See* 106 Fed. Cl. at 630.

We decline to take this approach. Instead, we agree with HUD that the applicable statutes unambiguously establish that the terms "eligible activities" and "certifications" don't encompass a tribe's report on its eligible housing units. *See* 25 U.S.C. § 4132 (1998) (explaining that eligible housing activities include housing assistance, development, housing services, housing management services, crime prevention, safety activities, and model activities); *id.* § 4112(c)(5) (listing certifications); *id.* § 4114(b)(1) (requiring certification regarding labor standards); *id.* § 4115(c) (requiring environmental certification).

We see nothing in these statutes pertaining to a tribe's report of its eligible housing units. And because these statutes therefore unambiguously resolve this issue, we see no need to apply the Indian canon. Accordingly, we part ways with both the Ninth Circuit and the Court of Federal Claims to the extent those courts have held that when HUD reviews a tribe's report of its eligible housing stock, that review falls within the scope of HUD's authority to review or audit a tribe's activities and certifications. *See* § 4165(a)(1) (1998); § 4165(b)(1)(A)(i)(II) (2006).

For similar reasons, we reject the Court of Federal Claims' conclusion that HUD's review of a tribe's report on its eligible housing units falls within the second and third categories of HUD's § 4165 authority, i.e., within HUD's authority to

13

review or audit a tribe's Indian housing plan or its performance reports. *See* § 4165(a)(2), (3) (1998); § 4165(b)(1)(A)(iii), (B) (2006); *see also Lummi*, 106 Fed. Cl. at 630 (reading § 4165 "as conferring broad authority on the Secretary to review a grant recipient's performance under NAHASDA, including monitoring a grant recipient's compliance with its Indian housing plan and verifying the accuracy of the recipient's performance reports"). Again, nothing in the relevant statutes suggests that either a tribe's Indian housing plan or its performance reports must (or even may) include information about the number of eligible housing units in that tribe's possession. *See* § 4112 (1998) (discussing Indian housing plans); 25 U.S.C. § 4164 (1998) (discussing performance reports). Instead, "[t]he Formula Response Form is the only mechanism that a recipient shall use to report changes to the number of FCAS." 24 C.F.R. § 1000.315(b).

In short, reviewing a tribe's report on its eligible housing units doesn't fall within any of § 4165's three defined categories of audit-and-review authority. Accordingly, HUD didn't recapture the alleged overpayments at issue here based on findings HUD made "pursuant to reviews and audits under [§ 4165]."[6] 24 C.F.R. §

---

[6] Because we conclude that neither § 4165 (1998) nor 24 C.F.R. § 1000.532 (1998) applies to HUD's recapture of the funds, we reject the Tribes' argument that those provisions operated to bar HUD from recapturing the funds at all—with or without a hearing—unless HUD first demonstrated that the Tribes hadn't already spent those funds on affordable housing activities. *See, e.g.*, § 4165(c) (1998) (allowing HUD to "adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits . . . under this section, except that grant amounts already expended on affordable housing activities may not be

14

1000.532(a) (1998). And that means HUD was under no obligation to afford any of the Tribes "a hearing in accordance with [24 C.F.R.] § 1000.540" under 24 C.F.R. § 1000.532(b) (1998).

## ii

Alternatively, the Tribes argue that even if they weren't entitled to hearings under 24 C.F.R. § 1000.532(b) (1998), they were nevertheless entitled to hearings under § 4161 (1998). For two reasons, we again disagree.

### a

In relevant part, § 4161 (1998) provides,

[I]f the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary shall—
    **(1)** terminate payments under this chapter to the recipient;
    **(2)** reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;
    **(3)** limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or
    **(4)** in the case of noncompliance described in section 4162(b) of this title, provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title.

§ 4161(a) (1998).

According to the Tribes, § 4161(a) (1998)'s hearing requirement applies here because HUD "reduce[d]" the Tribes' NAHASDA payments under § 4161(a)(2) (1998). But § 4161(a)(2) (1998) only applies when HUD "reduce[s] payments" to a

_____

recaptured or deducted from future assistance provided on behalf of an Indian tribe."); 24 C.F.R. § 1000.532(a) (1998) (same).

tribe "by an amount equal to the amount of such payments that were not *expended* in accordance with" NAHASDA. § 4161(a)(2) (1998) (emphasis added). And as HUD notes, it has never suggested or alleged that the Tribes "expended" the alleged overpayments in such a manner. *Id.* Instead, HUD alleged only that the Tribes' wrongly *received* the alleged overpayments.

Relying on *City of Boston v. Department of Housing and Urban Development*, 898 F.2d 828 (1st Cir. 1990), the Tribes characterize HUD's emphasis on § 4161(a)(2) (1998)'s use of the term "expended" as "hyper-technical," Aplee. Br. 31 (quoting *Boston*, 898 F.2d at 832).

In *Boston*, the statute at issue required HUD to provide a hearing before it "terminate[d] . . . payments" to the grant recipient. 898 F.2d at 831. And HUD argued that because the grant recipient hadn't yet "received any funds . . . there was no 'termination' of 'payments.'" *Id.* The First Circuit rejected this "hyper-technical" interpretation of the statute. *Id.* at 832. But in doing so, it relied on other language in the statute at issue—language that suggested Congress was concerned with "withhold[ing] relevant funding whenever a recipient . . . failed to comply with the controlling law," regardless of "[w]hether the promised payments ha[d] or ha[d] not begun." *Id.* Here, the Tribes point to no similar language that suggests Congress, in drafting § 4161, was concerned with money that the Tribes wrongfully received, as opposed to money they wrongfully expended. Accordingly, the Tribes' reliance on *Boston* is misplaced.

16

So too is their reliance on *Kansas City v. Department of Housing and Urban Development*, 861 F.2d 739 (D.C. Cir. 1988). The Tribes assert that, in *Kansas City*, the court treated as applicable a statute that allowed HUD to "reduce [grant] payments to the recipient . . . by an amount equal to the amount of such payments which were not *expended*" properly, 861 F.2d at 740 (emphasis added) (quoting 42 U.S.C. § 5311 (1982))—even though "[t]here was no allegation of unlawful expenditure[s]," Aplee. Br. 31.

But it doesn't appear that either the parties or the court in *Kansas City* addressed any possible distinction between expending funds and receiving them. In fact, the Tribes acknowledge as much in arguing that *Kansas City* "implicitly" resolves this issue. Aplee. Br. 30. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Thus, we decline to rely on *Kansas City*'s "implicit[]" answer to the question of § 4161's applicability. Aplee. Br. 30.

Instead, we adopt the Ninth Circuit's explicit answer to this precise question. When HUD alleges only that a tribe incorrectly *received* funding—but makes "no determination on whether any NAHASDA funds [were] improperly *expended*"— HUD doesn't "act under § 4161, and, accordingly," isn't subject to § 4161's hearing requirement. *Crow Tribal Hous. Auth.*, 781 F.3d at 1102 & n.5 (emphasis added); *cf. Fort Belknap Hous. Dep't*, 726 F.3d at 1106 (holding that § 4161 wasn't implicated where HUD alleged only that tribe wrongly received funding for ineligible housing

17

units, not that tribe expended those funds in manner that wasn't "in accordance with" NAHASDA (quoting § 4161(a)(1)(B))). And because HUD has never challenged the Tribes expenditures of the alleged overpayments, we agree with HUD that the Tribes weren't entitled to hearings under § 4161 (1998).

**b**

Alternatively, even if we agreed with the Tribes that there exists no meaningful distinction between receiving funds and expending them, we would nevertheless conclude that § 4161 (1998) doesn't apply to HUD's recapture of the alleged overpayments.

In relevant part, § 4161 (1998) provides, "[I]f the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has *failed to comply substantially* with any provision of this chapter, the Secretary shall," e.g., "reduce payments . . . to the recipient." § 4161(a)(2) (1998) (emphasis added). According to HUD, it has never suggested that the Tribes' alleged inflation of their eligible housing units constitutes substantial noncompliance. Thus, HUD concludes, § 4161 doesn't apply. *Cf. Fort Belknap Hous. Dep't*, 726 F.3d at 1104 (holding that applicable version of § 4161 didn't apply where "HUD neither alleged nor found" substantial noncompliance).

To support this argument, HUD points out that Congress amended § 4161 in 2008 to clarify that a recipient's failure "to comply with the requirements . . . regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance." Pub. L. No. 110–411, § 4161(2), 122

18

Stat 4319. HUD asserts that this amendment amounts to a clarification rather than a substantive change. Thus, HUD concludes, the amendment applies retrospectively to HUD's pre-2008 recaptures of the alleged overpayments. *See Dobbs v. Anthem Blue Cross & Blue Shield* (*Dobbs II*), 600 F.3d 1275, 1282 (10th Cir. 2010) ("[A] true clarification applies retrospectively.").

In determining whether the 2008 amendment applies retrospectively, we begin by asking whether "Congress has expressly prescribed the proper reach" of that amendment. *Id.* To that end, HUD points out that a Senate Report subtitle explicitly refers to the 2008 amendment as a "[c]larification." S. Rep. No. 110-238, at 10 (2007).

By "us[ing] . . . the term 'clarification'" in the 2008 amendment's legislative history, Congress unambiguously expressed "an intent that the amendment apply retrospectively." *Dobbs II*, 600 F.3d at 1282; *see Dobbs v. Anthem Blue Cross & Blue Shield* (*Dobbs I*), 475 F.3d 1176, 1178 (10th Cir. 2007) (remanding to district court to apply amended statutory language where "amendment's legislative history suggest[ed] that Congress expanded [relevant] definition to clarify . . . legal ambiguity"); *cf. Andrus v. Allard*, 444 U.S. 51, 59 n.10 (1979) (accepting Senate Report's indication that amendment constituted "a clarification rather than a substantive change in the reach of the law"); *Danielson v. Flores* (*In re Flores*), 735 F.3d 855, 860-61 (9th Cir. 2013) (relying on title of House Report to interpret ambiguous statute).

In fact, as HUD points out, the Ninth Circuit has already relied on the language of this same Senate Report to conclude that (1) "the 2008 amendment was a clarification, not a substantive change to" § 4161, and (2) the amendment therefore applies retrospectively. *Crow*, 781 F.3d at 1101. We agree with the Ninth Circuit on this point, and we conclude that the Tribes' failure to accurately report their eligible housing units, standing alone, doesn't constitute substantial noncompliance. *See* § 4161(a)(2) (2009) ("The failure of a recipient to comply with the requirements of [25 U.S.C. § 4152(b)(1)] regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance for purposes of this subchapter.").

Because we see no indication that HUD ever suspected or alleged substantial noncompliance on the part of the Tribes, we conclude that HUD didn't act pursuant to § 4161 (1998)—and therefore wasn't subject to § 4161 (1998)'s hearing requirement—when it recouped the alleged overpayments. *See Crow*, 781 F.3d at 1101-02 (holding that HUD didn't "act under § 4161, and, accordingly, could not have violated a hearing requirement under that section," when HUD never alleged substantial noncompliance).

**B**

For the reasons discussed above, we agree with HUD that it didn't act under § 4161 (1998) or 24 C.F.R. § 1000.532 (1998) when it recaptured the funds. But this conclusion is a double-edged sword. True, it resolves one question in HUD's favor: it means the district court erred in ruling that HUD was required to provide hearings

20

before recouping the funds. But it raises a second, more fundamental question: in the absence of an applicable statute or regulation, what gave HUD the authority to recoup the funds at all? *See Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) (explaining that federal agencies are "creature[s] of statute"); *see also Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("[I]f there is no statute conferring authority, a federal agency has none.").

In attempting to answer that question, HUD asserts that rather than proceeding under a statute, it recaptured the funds by using "its longstanding, common-law authority to recover payments made by mistake." Aplt. Br. 27. As support for this argument, HUD cites six cases.[7] None of them apply here.

Of the six cases that HUD cites, only the Ninth Circuit's decision in *Fort Belknap* even arguably addresses whether a government agency administering a grant program can rely on this common-law right to unilaterally recover overpayments from a beneficiary. And the Ninth Circuit itself has since characterized this portion of *Fort Belknap* as dicta. *See Crow Tribal Hous. Auth.*, 781 F.3d at 1105 n. 9. We agree. The question in *Fort Belknap* wasn't whether HUD had common-law authority to recoup NAHASDA overpayments. Instead, the "narrow issue resolved in *Fort Belknap* was whether [the Ninth Circuit] had jurisdiction to consider the tribe's direct appeal." *Id.* at 1104. And that question turned solely on whether HUD acted under

---

[7] HUD cites additional cases in its reply brief. But like the cases that HUD cites in its opening brief, these additional cases simply don't address or implicate the specific factual scenario we face here.

§ 4161(a)—not on whether HUD had authority to act pursuant to some common-law right. *See Fort Belknap*, 726 F.3d at 1100.

The next three cases that HUD cites are likewise unhelpful. They stand only for the limited proposition that the government has a right, even in the absence of express statutory authority, to *sue* to collect overpayments. *See United States v. Wurts*, 303 U.S. 414, 416 (1938) (citing "[g]overnment's long-established right to sue for money wrongfully or erroneously paid from the public treasury");[8] *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15-16 (1st Cir. 2005) (noting "government's right to sue" to "recover monies wrongly paid from the Treasury, even absent any express statutory authorization"); *LTV Educ. Sys., Inc. v. Bell*, 862 F.2d 1168, 1169-70, 1175 (5th Cir. 1989) (citing government's authority to "recover money it mistakenly, erroneously, or illegally paid" where Department of Education sued based on alleged violation of federal regulation). Because HUD opted instead to unilaterally recoup the overpayments, rather than to sue for their return, these cases are inapposite.

That leaves only *United States v. Munsey Trust Co.*, 332 U.S. 234, 236 (1947), and *Grand Trunk Western Railway Co. v. United States*, 252 U.S. 112, 117 (1920).

---

[8] Judge Bacharach asserts that "five federal appellate courts have interpreted *Wurts* to allow offset without the need for suit." Op. of Bacharach, J., 4 & n.2. But none of the cases he cites address whether the federal government enjoys common-law authority to recoup funds via administrative offset in the context of a grant program. And for reasons we discuss below, that distinction makes a difference.

At first glance, *Grand Trunk* appears to support HUD's assertion that it enjoys common-law authority to recover overpayments via administrative offset. There, the Court held that the Postmaster General "was under no obligation to establish the [alleged overpayment] by suit." 252 U.S. at 120-21. Instead, "[h]aving satisfied himself" of the alleged overpayment, "he was at liberty to deduct the amount of the overpayment from the moneys otherwise payable to the company to which the overpayment had been made." *Id.*

But in *Grand Trunk*, the government didn't mistakenly overpay the beneficiary of a grant and then withhold the amount of the overpayment from that beneficiary's future-year grant funds, as HUD did here. Instead, the overpayments in *Grand Trunk* arose in the context of a contractual relationship between the government and the plaintiff: the government entered into a series of "successive quadrennial contracts" under which "the mails were carried over" a certain stretch of the plaintiff's railroad. *Id.* at 117, 121. And when the Postmaster General realized that the government had previously overpaid the plaintiff for its use of that stretch of its track, he simply "deduct[ed] the amount of the overpayment" from the amount the government owed "under the current contract." *Id.* The plaintiff sued, the Court of Claims dismissed, and the Supreme Court affirmed. *Id.* at 117.

Properly limited to its facts, *Grand Trunk* establishes that when the government enters into a series of contracts with a private party, it can deduct any amount it erroneously overpays that private party "by means of a later debit" to the parties' "running accounts." *Id.* at 121. But this appeal doesn't arise from a

23

contractual relationship. Instead, it arises from a grant program designed to help the Tribes and their members "improve their housing conditions and socioeconomic status." 25 U.S.C. § 4101(5). And Congress explicitly acknowledged in enacting that grant program that "the United States has undertaken a unique trust responsibility to protect and support Indian tribes and Indian people." § 4101(3).

That unique relationship sets this case apart from both *Grand Trunk* and *Munsey Trust*, which also arose from a series of contracts. *See Munsey Tr.*, 332 U.S. at 236-39; Richard B. Cappalli*, Federal Grants and Cooperative Agreements: Law, Policy, and Practice* § 8:15, at 81 (1991 Cum. Supp.) (explaining that "traditional contract principles are inapropos to an understanding of assistance rights and responsibilities" in context of grant funding); *cf. Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 762 F.2d 406, 409 (4th Cir. 1985) (rejecting argument that court should apply "contractual principles" to federal grant program, and explaining that grant programs are instead "governed by the applicable statute[s] and implementing regulations").

As these authorities suggest, the rules that traditionally govern contractual relationships don't necessarily apply in the context of federal grant programs. *See, e.g.*, Cappalli, § 8:15, at 80-81 (distinguishing between contracts and grants; explaining that grantor rights—including right to recapture funds—"must emanate explicitly or implicitly from the grant statutes, regulations duly enacted and consistent with the statute being implemented, or provisions in the grant agreement"; and noting that it's "unfair to subject the grantee to unannounced and undefined

24

sanctions and remedies" in absence of such provisions). Based on the government's

"unique trust responsibility to protect and support Indian tribes and Indian people,"

§ 4101(3), we think it would be particularly "unfair," Cappalli, § 8:15, at 80, to apply

common-law contract principles to HUD's recapture of NAHASDA funds. Thus,

neither *Grand Trunk* nor *Munsey Trust* can support the weight of HUD's common-

law-authority argument.

Accordingly, we hold that the district court properly rejected HUD's common-

law-authority argument. And because HUD hasn't advanced on appeal any

alternative basis for its authority to recapture the funds via administrative offset,[9] we

---

[9] Judge Bacharach suggests that if HUD doesn't enjoy common-law authority to recoup the overpayments by administrative offset, this leaves "a gap in NAHASDA" that HUD necessarily enjoys implicit "authority to fill." Op. of Bacharach, J., 8-9. But HUD has never advanced such an implicit-authority argument—either below or on appeal. Thus, it has waived reliance on any implied-authority theory as a basis for reversal. *See Bronson v. Swensen*, 500 F.3d 1099, 1104-05 (10th Cir. 2007) (finding waived and declining to address argument that appellant failed to "adequately raise and pursue" in opening brief); *see also Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters *the parties present*." (emphasis added)).

In any event, even assuming it would be appropriate for us to sua sponte reach this issue, the cases that Judge Bacharach cites in support of his implicit-authority theory indicate only that HUD enjoys authority to fill gaps in NAHASDA by promulgating rules and regulations. *See id.* at 9; *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute *by regulation*." (emphasis added)); *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and *the making of rules* to fill any gap left, implicitly or explicitly, by Congress." (emphasis added)); *Morrow v. Clayton*, 326 F.2d 36, 45

25

therefore affirm the district court's ruling that HUD acted illegally by recapturing the alleged overpayments.

## C

But this victory for the Tribes is largely a hollow one. That's because HUD enjoys sovereign immunity from claims for money damages. *See Utah ex rel. Utah Dep't of Envtl. Quality v. EPA*, 765 F.3d 1257, 1260 (10th Cir. 2014) (explaining that suits against federal agencies are barred by sovereign immunity absent a specific waiver of that immunity); *see also* 5 U.S.C. § 702 (waiving sovereign immunity for

---

(10th Cir. 1963) ("We think the *promulgation of the regulation* by the Secretary was a lawful exercise of the power and authority vested in him [by statute] to administer the program . . . ." (emphasis added)). Yet Judge Bacharach doesn't identify a rule or regulation that would allow HUD to recoup overpayments by administrative offset. Neither does HUD. Thus, even assuming that "Congress implicitly delegated to HUD the authority to fill [NAHASDA's] statutory gap" by promulgating such a regulation, Op. of Bacharach, J., 10, it doesn't appear that HUD exercised that implicit authority here. Accordingly, even if it were appropriate for us to raise this theory sua sponte, *see Greenlaw*, 554 U.S. at 243, it wouldn't provide a basis for reversal.

As a final matter, Judge Bacharach suggests that the Tribes have somehow waived any argument that such rules or regulations *don't* exist. *See* Op. of Bacharach, J., 11 ("[T]he [T]ribes have not questioned the sufficiency of HUD's implementing regulations."); *id.* at 11 n.5 ("The [T]ribes have argued only that HUD lacked statutory authority, not that HUD failed to properly implement that authority by adopting regulations."). But as the appellant, HUD must identify a valid basis for reversing the district court's rulings. *See Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."). As appellees, on the other hand, the Tribes have no obligation to attempt to refute a potential basis for reversal that HUD has never advanced. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994) ("In preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed . . . ." (quoting *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir. 1983))). Contrary to Judge Bacharach's suggestion, therefore, the Tribes simply cannot waive a response to an argument that HUD doesn't make.

claims against agencies, but only for suits "seeking relief *other than* money damages" (emphasis added)). And at least some of the district court's orders directing HUD to repay the Tribes appear to award money damages.

The crux of the Tribes' claims is this: HUD wrongfully decreased their NAHASDA funding in various years by subtracting (1) the amount of any alleged overpayments the Tribes received in previous years from (2) the amounts to which the Tribes would have otherwise been entitled in subsequent years. For instance, HUD concluded that the Choctaw received overpayments in 1998, 1999, 2000, and 2001. HUD then deducted those alleged overpayments from the NAHASDA funding that the Choctaw otherwise would have received in 2003, 2004, and 2005. Thus, what the Choctaw sought was return of the 2003, 2004, and 2005 funding that HUD wrongfully withheld.

But the district court didn't order HUD to repay the Tribes until many years after HUD recaptured the alleged overpayments. For instance, the court didn't order HUD to repay the Choctaw until 2014—approximately a decade after HUD withheld the relevant funds. And perhaps because it recognized the distinct possibility that HUD had long since distributed all of the funds from Congress' 2003, 2004, and 2005 NAHASDA appropriations, the court ordered HUD to repay the Choctaw "from all available sources," including (1) funds that were "carried[] forward from previous fiscal years" and (2) funds that were "appropriated in future grant years." App. vol. 12, 2463.

Citing this aspect of the district court's order, HUD asserts that the court awarded the Tribes money damages in violation of § 702. We agree.[10]

The phrase "money damages" "refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988)).

Here, the district court awarded the Tribes money damages when it ordered HUD to compensate them using funds from grant years other than the grant years during which HUD wrongfully collected the alleged overpayments. For instance, the "very thing" to which the Choctaw said it was entitled was additional funding from Congress' 2003, 2004, and 2005 NAHASDA appropriations. *Blue Fox, Inc.*, 525 U.S. at 262 (quoting *Bowen*, 487 U.S. at 895). But to the extent that HUD had already distributed the funds from those yearly appropriations to other tribes, HUD couldn't have possibly returned those funds to the Tribes. Thus, the district court instead ordered HUD to pay the Tribes by "substitut[ing]" *other* funds for the funds to which

---

[10] The district court previously ordered HUD to set aside a portion of the 2008 NAHASDA appropriation for the purpose of repaying the Tribes. To the extent that (1) any of the Tribes allege that HUD wrongfully withheld 2008 NAHASDA grant funds, and (2) the 2008 funds that HUD set aside were sufficient to cover those Tribes' 2008 losses, this sovereign-immunity analysis doesn't apply. For instance, HUD concedes that the district court's order directing HUD to repay the Navajo doesn't constitute an award of money damages.

28

the Tribes were actually entitled—i.e., funds from past- or future-year NAHASDA appropriations. *Id.* (emphasis omitted) (quoting *Bowen*, 487 U.S. at 895).

This distinction may seem pedantic. After all, money is money. And surely the Tribes don't care whether HUD repaid them using funds that remained from 2003's NAHASDA appropriation, or if it instead repaid them from some other source. But "the fungibility [of] money" can easily "obscure[]" the difference between (1) "relief that seeks to compensate a plaintiff for a harm by providing a substitute for the loss," *Cty. of Suffolk v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) (emphases omitted), and (2) "relief that requires a defendant to transfer a specific *res* to the plaintiff," *id.*

To understand how that distinction operates to preclude relief here, assume for a moment that instead of withholding funds for affordable housing from a particular tribe, HUD instead wrongfully withheld from that tribe an *actual house*—a house that HUD then gave to another eligible tribe.

Because that specific house is no longer in HUD's possession, the district court can't order HUD to turn it over to the tribe that should have originally received it. Instead, the best the district court can do is order HUD to give that tribe the house's monetary equivalent. And that monetary equivalent amounts to substitute relief—i.e., money damages. *See Blue Fox, Inc.*, 525 U.S. at 262; *cf. Clymore v. United States*, 415 F.3d 1113, 1118, 1120 (10th Cir. 2005) (remanding for findings regarding whether government still had in its possession the "four items seized from [plaintiff] at the time of his arrest"; "to the extent the government [was] no longer in

29

possession of" plaintiff's property and plaintiff thus instead sought "monetary relief, sovereign immunity bar[red] his claim").

If sovereign immunity would bar the district court from ordering HUD to provide the tribe in this hypothetical scenario with "the cash equivalent" of the wrongfully withheld house, it likewise barred the district court from ordering HUD to provide the Tribes with the "cash equivalent" of the wrongfully withheld overpayments. *Diaz v. United States*, 517 F.3d 608, 611 (2d Cir. 2008); *cf. id.* at 612-13 (holding that doctrine of sovereign immunity precluded court from ordering government to pay "monetary equivalent" of seized currency, which could "no longer be identified or located in the coffers of the government"; reasoning that "currency should be treated like any other seized property: if the property is no longer available, sovereign immunity bars the claimant from seeking compensation").

And this rationale—i.e., the idea that courts should treat money like any other form of property for sovereign-immunity purposes—explains why two of our sister circuits have found the distinction between original funds and substitute funds dispositive in cases involving yearly grant appropriations. *See Suffolk*, 605 F.3d at 141 (explaining that because the "*res* at issue is identified by reference to the congressional appropriation that authorized the agency's challenged expenditure," a claim seeking funds from any other source "seek[s] compensation rather than the specific property the plaintiff aims to recover," and therefore "falls outside the scope of the waiver of sovereign immunity arising from § 702"); *see also City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("An award of

30

monetary relief from any source of funds other than the [relevant fiscal year] appropriation would constitute money damages rather than specific relief, and so would not be authorized by [§ 702].")[11]; *cf. Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 830 (D.C. Cir. 2000) (discussing *Houston* and reiterating that HUD's "commitment of the appropriated [grant] funds to other recipients and the expiration of the congressional appropriation" in *Houston* rendered "an award from other available HUD funds . . . money damages as opposed to specific relief").

The Tribes attempt to distinguish the facts in *Houston* and *Suffolk* from the facts here. First, they point out that HUD treats NAHASDA funds as interchangeable from year to year, by, e.g., "us[ing] funds appropriated in fiscal years 1998-2008 both to augment underfunding in prior fiscal years and to supplement funds appropriated in subsequent fiscal years." Aplee. Br. 75-76.

---

[11] Judge Matheson asserts that "we should follow *Bowen*," rather than *Houston* and *Suffolk*. Op. of Matheson, J., 11. But the issue we confront today—i.e., whether an order to pay a grant recipient from a source of funds other than the relevant fiscal year appropriation constitutes an award of money damages—simply didn't arise in *Bowen*. On the contrary, it doesn't appear that the district court in *Bowen* ordered the federal government to transfer *any* funds to Massachusetts, let alone that it ordered the government to transfer those funds from a source other than the original one. *See Bowen*, 487 U.S. at 888 (noting that "judgment did not purport to state what amount of money, if any, was owed by the United States to Massachusetts, nor did it order that any payment be made"). Instead, it appears that Massachusetts may have simply remained in possession of the disputed funds all along, thus rendering it unnecessary for the district court to order their return—and likewise rendering it unnecessary for the Supreme Court to address whether such an order might constitute an award of money damages. *See, e.g., id.* at 884 & n.3 (noting that applicable statute allowed Massachusetts to retain disputed funds "pending resolution of the dispute").

31

The Tribes appear to suggest that by treating NAHASDA funds as interchangeable from year to year, HUD somehow implicitly waived its sovereign immunity against claims for money damages. But "[a] waiver of sovereign immunity 'cannot be implied'"; it "must be unequivocally expressed." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). Thus, to the extent that HUD shuffles NAHASDA funding between years, that fact is only relevant if by virtue of such shuffling, funds from the relevant yearly appropriations remained at HUD's disposal when the district court ordered it to repay the Tribes. If not, then the district court's order constituted an order to provide "money damages rather than specific relief, and so [it wasn't] authorized by [§ 702]." *Houston*, 24 F.3d at 1428.

In a related argument, the Tribes note that NAHASDA appropriations are "'no-year' appropriations." Aplee. Br. 74. And "[a] no-year appropriation is available for obligation without fiscal year limitation." 1 U.S. General Accounting Office, Office of the General Counsel, *Principles of Federal Appropriations Law*, at 5-6 (2d ed. 1991). Thus, the Tribes assert, the "*res*" at issue here "is the sum of *all* NAHASDA appropriations, carried forward and backward as they may be." Aplee. Br. 78 (emphasis added).

But the *Houston* court rejected a very similar argument. There, the district court ruled that "the lapse of the appropriation from which fiscal 1986 [grant] monies were drawn meant that there were no funds available from which HUD could lawfully repay" the plaintiff. 24 F.3d at 1424. The plaintiff challenged this ruling on

appeal, arguing that HUD could nevertheless repay it by using "'no-year' funds that [were] not reserved for use in any particular year or for particular projects." *Id.* at 1428. The D.C. Circuit disagreed, reasoning that those "no-year" funds constituted "[a]n award of monetary relief from a[] source of funds other than the 1986 . . . appropriation." *Id.*

So too here. Thus, to the extent the district court ordered HUD to repay the Tribes "from all available sources," *e.g.*, App. vol. 12, 2463, we hold that those orders constitute awards of money damages unless HUD had at its disposal sufficient funds from the relevant yearly appropriations. Accordingly, we reverse in part and remand to the district court for factual findings regarding whether, at the time of the district court's order, HUD had the relevant funds at its disposal.[12]

\* \* \*

In resolving this appeal, our divided panel unanimously agrees on one thing: the district court erred in ruling that a statute or regulation applies to render HUD's recapture of the alleged overpayments *sans* hearings illegal. But beyond that, unanimous agreement eludes us. Instead, we form two different majorities in answering the other two questions this appeal presents.

Two members of the panel agree that the only potential alternative source of authority HUD identifies on appeal is its common-law right to recover payments

---

[12] For the reasons discussed above, *see supra* n.9, we affirm the district court's order directing HUD to return to the Navajo the funds it wrongfully recaptured from that tribe in 2008, but only to the extent that sufficient funds were set aside from the 2008 NAHASDA appropriation for that purpose.

made by mistake. And because the same two members of the panel agree that this common-law right doesn't apply under the circumstances present here, we conclude that HUD lacked authority to recapture the funds. Accordingly, we affirm the district court's order to the extent that it characterizes the recaptures as illegal.

But two other members of this panel agree that even if HUD illegally recaptured the funds, the doctrine of sovereign immunity nevertheless precluded the district court from ordering HUD to repay the Tribes. Thus, with one exception, we reverse the portion of the district court's order that directs HUD to repay the Tribes and remand for factual findings regarding whether any of the recaptured funds remained in HUD's possession when the district court ordered it to repay the Tribes.

*Modoc Lassen Indian Housing Authority, et al. v. United States Department of Housing and Urban Development, et al.*, Nos. 14-1313, 14-1331, 14-1338, 14-1340, 14-1343, 14-1407, 14-1484, and 15-1060.

**MATHESON**, **J.**, concurring in part and dissenting in part.

I join Judge Moritz's opinion except for Part II.C., which holds that, to the extent HUD no longer had the Tribes' particular funds, sovereign immunity bars the Tribes from recovering. The majority[1] concludes that HUD enjoys sovereign immunity because the agency had allocated the money the Tribes seek and ordering HUD to pay the Tribes from any other source would constitute impermissible "money damages."

The Supreme Court has explained that the nature of the relief sought, not the source of the funds, determines whether sovereign immunity applies. The Tribes are seeking specific relief—enforcement of NAHASDA's mandate. They are not seeking damages, and therefore the waiver of sovereign immunity in the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, applies.

Although sovereign immunity poses no bar to the Tribes' recovery, a different limitation—the Appropriations Clause—may prevent them from obtaining their funds.[2] HUD can disburse funds only according to the terms of the appropriations it receives from Congress. The district court did not determine whether HUD has appropriations available to satisfy the Tribes' entitlements under NAHASDA. I therefore agree that we

---

[1] Because Judge Bacharach joins Part II.C. of Judge Moritz's opinion regarding sovereign immunity, I will refer to it as the "majority."

[2] The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const., art. I, § 9, cl. 7.

should vacate the judgments, but I would remand for the district court to address the appropriations issue.

The following discussion attempts to expand and support these points.

A. **Sovereign Immunity, APA § 702, Specific Relief, and "Money Damages"**

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "[A] waiver of sovereign immunity must be unequivocally expressed in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (quotations omitted).

Section 702 of the APA provides such a waiver:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

5 U.S.C. § 702 (emphasis added).

The Supreme Court addressed the meaning of § 702's "money damages" phrase in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). Massachusetts claimed the federal government owed it Medicaid payments. Under Medicaid, the federal government provides financial assistance to states to provide low-income individuals with health care. *See id.* at 883-84. When the federal government "disallowed"—i.e., refused to pay—certain expenses, Massachusetts sued for the money by asking the district court to reverse the disallowances. *Id.* at 886-88. The Supreme Court held Massachusetts's case fell

within § 702's waiver because it "[was] not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather it [was] a suit seeking to enforce the statutory mandate itself, which happen[ed] to be one for the payment of money." *Id.* at 900. The Court explained that § 702 does not bar actions that seek "monetary relief," only ones seeking "money damages." *See id.* at 896-97.

Interpreting § 702, the Court distinguished *substitutionary* relief, which compensates the plaintiff for its losses, from *specific* relief, which gives the plaintiff the thing to which it is entitled. *See id.* at 893. For example, when a plaintiff suffers "an injury to his person, property, or reputation," an award of "monetary compensation," or "damages," serves to substitute for that loss. *Id.* By contrast, "specific relief" includes "an order . . . for the recovery of specific property *or monies*, ejectment from land, or injunction either directing or restraining the defendant officer's actions." *Id.* (quotations omitted). The Court quoted the D.C. Circuit: "'Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled."'" *Id.* at 895 (quoting *Md. Dep't of Human Res. v. Dep't of Health and Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.) (in turn quoting D. Dobbs, Handbook on the Law of Remedies 135 (1973))).

Monetary relief can be specific or substitutionary. Thus, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. Money is often substitutionary,

such as when it compensates a plaintiff for a personal injury, but the monetary relief in *Bowen* was specific because Massachusetts sought "to enforce the statutory mandate itself, which happen[ed] to be one for the payment of money." *Id.* at 900.

In contrast to *Bowen*, the Supreme Court ruled in *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 256-57 (1999), that sovereign immunity barred the plaintiff's lawsuit because it sought substitutionary relief. Blue Fox was a subcontractor on an Army construction project. *Id.* The general contractor became insolvent and left the project without paying Blue Fox under the subcontract. *Id.* Blue Fox sued the Army in federal district court, attempting to acquire and enforce an "equitable lien" on the Army's remaining project funds. *Id.* at 258. The Supreme Court held sovereign immunity barred Blue Fox's lawsuit. *Id.* at 263. *Bowen*'s analysis of § 702, the Court explained, turns on the distinction "between specific relief and compensatory, or substitute, relief," not on whether the action is equitable or legal. *Id.* at 261-62. Blue Fox sought substitutionary relief because "by their nature" equitable liens "[do] not give the plaintiff the very thing to which he was entitled; instead [they] merely grant[] a plaintiff a security interest in the property, which the plaintiff can then use to satisfy a money claim." *Id.* at 262-63 (brackets, citation, and quotations omitted). The lien was "a means to the end of satisfying a claim for the recovery of money," and was substitute, not specific, relief. *Id.*

Together, *Bowen* and *Blue Fox* reveal that the function of the remedy is critical to whether the action falls within § 702's waiver. In *Bowen*, the remedy was fulfilment of the plaintiff's statutory entitlement to federal payments under Medicaid. 487 U.S. at 900. The *Bowen* suit fit within § 702's waiver because it gave the plaintiff the specific thing—

- 4 -

federal Medicaid payments—to which it was entitled.  In *Blue Fox*, the plaintiff sought, through an equitable lien, "money in the hands of the Government as compensation for the loss resulting from the default of the prime contractor."  525 U.S. at 263.  The *Blue Fox* suit was outside § 702's waiver because it did not concern the thing the plaintiff was owed—payment from the general contractor—and was thus substitutionary.

In sum, under the Supreme Court's cases, the distinction between specific and substitutionary relief turns on the nature of the relief, not on the source of funds.

B.  **Application**

This case is similar to *Bowen*.  The Tribes seek enforcement of their entitlement to NAHASDA funds.  *See* 25 U.S.C. § 4111(a)(1) ("[T]he Secretary shall . . . make grants under this section on behalf of Indian tribes . . . .").  The Tribes do not allege the government destroyed or damaged their housing units or that other harms arose from the government's recapture of grant funds or failure to pay in a timely fashion.  The Tribes seek only the grant funds themselves—the very thing to which they are entitled.  As in *Bowen*, the Tribes have sued as statutory beneficiaries to enforce a mandate for the payment of money by the federal government.  This is not a suit for damages, § 702's waiver applies, and sovereign immunity poses no bar.[3]

---

[3] The majority states that "whether an order to pay a grant recipient from a source of funds other than the relevant fiscal year appropriation constitutes an award of money damages . . . simply didn't arise in *Bowen*."  Maj. op. at 31 n.11.  But the cases are closer than this statement suggests.  Massachusetts, similar to the Tribes here, was a recipient of a "grant-in-aid program."  *Bowen*, 487 U.S. at 882 n.1, 898, 908, and both Medicaid and NAHASDA are statutory mandates for the payment of money to certain beneficiaries.  The alleged disallowances in *Bowen* are similar to the alleged "administrative offset[s]"

- 5 -

C. **The Majority's Arguments**

The majority does not contend this case is closer to *Blue Fox* than *Bowen*. Its analysis rests on a meaning of "substitutionary" relief drawn from out-of-circuit cases that differs from the Supreme Court's precedent. The majority concludes the Tribes are requesting substitutionary relief because HUD has already disbursed the wrongfully recaptured funds and would now have to repay the Tribes with *other* moneys. I address this rationale and then discuss the two cases the majority relies on for support.

1. *Source of the funds*

The majority contends the district court awarded substitutionary relief because HUD had disbursed the funds that should have gone to the Tribes. Maj. op. at 28-29. Under this view, the source of funds to pay the Tribes matters. But using different *dollars* to satisfy the Tribes' specific entitlement does not make the Tribes' *relief* substitutionary. As discussed above, the function of the remedy determines whether it is specific or substitutionary. The Tribes are requesting specific relief because, just like in *Bowen*, they seek enforcement of "the statutory mandate itself, which happens to be one for the payment of money." 487 U.S. at 900. In *Bowen*, Massachusetts was not asking to recover the exact same dollars the government had refused to pay it. Any dollars would

---

here. Maj. op. at 6. Apart from the differences between these funding programs, *Bowen* established that whether § 702 applies turns on the nature of the requested relief; the case did not hinge on a particular fiscal year appropriation. As I discuss below, the majority's appropriations concern is properly couched as an issue under the Appropriations Clause, not sovereign immunity.

do. *See id.* at 884 n.3, 887 nn. 8-9 (noting it was unclear what had happened to the particular Medicaid funds).[4]

Other forms of tangible property—the majority uses the example of a house—can have unique aspects that make replacement by similar goods a close but imperfect substitute. But money is fungible, or, as the majority says, "money is money." Maj. op. at 29. The Tribes do not care, just as Massachusetts in *Bowen* did not care, which dollars they receive as long as their NAHASDA grant funds are paid to them. The majority errs in treating this dispute as though it were over rare coins. In *Bowen*, Justice Scalia recognized in dissent that the Court's discussion of "the very thing" to which Massachusetts was entitled was money, not particular currency. *See* 487 U.S. at 917-19 & n.3 (Scalia, J., dissenting).

The majority's house example shows why the Tribes are seeking specific, not substitutionary, relief under *Bowen*. The majority posits that if HUD had wrongfully given one tribe's house to another tribe, the most that the wronged tribe could recover would be the house's monetary equivalent, which would be substitute relief and "money damages." Maj. op. at 29-30. But that is not the situation we face here because money is

---

[4] As the majority notes, Maj. op. at 31 n.11, it was not clear to the Court in *Bowen* whether the Medicaid funds that Massachusetts claimed were in the state's or the federal government's possession: "The record does not tell us whether the State . . . elected to retain the amount in dispute." 487 U.S. at 887 n.8. In the face of that uncertainty, the Court still held the case was "within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910. The Court did not limit its holding to the majority's view that only a claim to recover the precise funds taken or withheld can qualify for § 702's sovereign immunity waiver. Rather, it adopted a specific-versus-substitutionary approach to relief under § 702. We should follow the Supreme Court's approach because *Bowen* is binding. The majority's cases from our sibling circuits are not.

interchangeable and houses are not.  The *Bowen* Court discussed in-kind benefits to

explain why suits for money can constitute specific relief:

> In the present case, [the State] is seeking funds to which a statute allegedly
> entitles it, rather than money in compensation for the losses, whatever they
> may be, that [the State] will suffer or has suffered by virtue of the
> withholding of those funds.  If the program in this case involved in-kind
> benefits this would be altogether evident.  *The fact that in the present case
> it is money rather than in-kind benefits that pass from the federal
> government to the states . . . cannot transform the nature of the relief
> sought*—specific relief, not relief in the form of damages.

*Bowen*, 487 U.S. at 895 (majority opinion) (emphasis added) (quoting *Md. Dep't of*

*Human Res.*, 763 F.2d at 1446).

When a plaintiff is entitled to a sum of money, receipt of money totaling that sum

brings the plaintiff the very thing to which it is entitled.  Fungible money does not

"substitute" for other money.  Money *is* money.

2.  *Circuit cases*

To support its view that the source of the funds matters for purposes of sovereign

immunity, the majority turns to two out-of-circuit cases.  As detailed below, however, the

results in these cases rested on mootness and the Appropriations Clause.  Their discussion

of § 702 and sovereign immunity is cursory and cannot be squared with *Bowen*.

a.  <u>City of Houston</u>

In *City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994), HUD awarded

Houston a grant of approximately $20 million out of 1986 appropriations.  *Id.* at 1424.

Four months later, HUD reduced the grant by $2.6 million and reallocated that money to

other grant recipients.  *Id.*  Houston sued, but not before the congressional act

- 8 -

appropriating the disputed money had lapsed. *Id.* Relying on the "well-settled" constitutional principle "that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation," the D.C. Circuit held the city's claim for monetary relief was moot because the appropriation was both lapsed and fully obligated. *Id.*; *see also id.* at 1427. The court explained the mootness problem stemmed from the Appropriations Clause. *See id.* at 1428 (discussing Appropriations Clause); *see also id.* ("Nothing in *Bowen* . . . even obliquely addresses the question of expired or fully obligated appropriations . . . .").

Although the D.C. Circuit grounded its holding in the Appropriations Clause, *see id.* at 1424, 1427, it tacked on a paragraph responding to Houston's "suggest[ion]" that HUD could pay the city using funds other than the 1986 grant funds, *id.* at 1428. The court said this would "run afoul" of § 702 because relief can be "specific" only when it is paid out of "a specific *res*." *Id.* Without further explanation or legal citation, the court announced: "An award of monetary relief from any source of funds other than the 1986 . . . appropriation would constitute money damages rather than specific relief, and so would not be authorized by APA section 702." *Id.*

But whether the government has particular funds to pay a given claim is unrelated to whether the plaintiff is seeking damages. In a more recent case, the D.C. Circuit has said that *Bowen* requires courts to "focus on the nature of the relief sought, not on whether the agency still has the precise funds paid," and that "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000);

- 9 -

*see also id.* at 830 ("[The plaintiff's] claim represents specific relief within the scope of 5 U.S.C. § 702, not consequential damages compensating for an injury. That the [defendant] no longer possesses the precise funds collected is not determinative of this analysis."). The court went on to distinguish *City of Houston*, where "[t]he principal issue . . . was mootness, not the question of allowable specific relief as opposed to unavailable money damages." *Id.*

### b. County of Suffolk

The majority also relies on *County of Suffolk v. Sebelius*, 605 F.3d 135 (2d Cir. 2010). The county claimed the Department of Health and Human Services had shortchanged it in awarding grant funds for an HIV/AIDS program in fiscal years 2007 and 2008. *Id.* at 137. Because those funds were exhausted, the Second Circuit held the Appropriations Clause made the case moot. *Id.* at 137-38. The court added, like the D.C. Circuit in *City of Houston*, that a plaintiff seeking to enforce a statutory mandate is limited to "the congressional appropriation that authorized the agency's challenged expenditure"; otherwise the suit becomes one for damages because no other "*res*" could provide "the specific property the plaintiff aims to recover." *Id.* at 141. And, again like *City of Houston*, the Second Circuit offered no explanation for why the source of the money matters for purposes of sovereign immunity.

Relying on these cases, the majority defines "the very thing" the Tribes are entitled to as the money for the particular NAHASDA grant years at issue. *See* Maj. op. at 28-29. But as discussed below, the annual appropriations point concerns whether HUD possesses properly appropriated funds to pay the Tribes, not whether the relief is

- 10 -

specific or substitutionary.  Instead of following the majority's cases,[5] we should follow

*Bowen*.

D. **NAHASDA Funding**

Even if the majority is correct that the Tribes must extract their relief from a

specific res to fit within § 702's sovereign immunity waiver, the majority has not

explained why we should reject the Tribes' argument that NAHASDA funding generally,

not particular yearly appropriations, is the relevant res.[6]  The Tribes argue that

appropriations under NAHASDA are "no-year" funds because they can be used across

---

[5] The majority also cites cases decided under Federal Rule of Criminal Procedure 41(g).  *See* Maj. op. at 29-30.  Such cases are inapt.

The rule provides:  "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."  The majority cites *Clymore v. United States*, 415 F.3d 1113 (10th Cir. 2005), where we held, without distinguishing between cash and other property, that a person cannot recover property under the rule if "the government no longer possesses the property." *Id.* at 1120.  The majority also looks to *Diaz v. United States*, 517 F.3d 608 (2d Cir. 2008), where the Second Circuit concluded the government enjoys sovereign immunity when it has wrongfully seized a defendant's money but also has disbursed it because, lacking the defendant's particular cash, the government could only pay back "the cash equivalent." *Id.* at 611.

These cases arose under a different legal provision.  Transplanting them to the § 702 context is unwarranted.  As one scholar has observed, Rule 41(g) by its terms "requires the existence of 'property' that is capable of return."  Colleen P. Murphy, "Money as a 'Specific' Remedy," 58 Ala. L. Rev. 119, 151 (2006).  By contrast, § 702, as *Bowen* explained, turns on whether the relief is specific or substitutionary. *See* 487 U.S. at 893; *see also* Murphy, *supra*, at 142 (explaining the *Bowen* "majority construed 'damages' in section 702 of the APA to connote substitutionary monetary relief").  "Thus, an even stronger argument can be made under section 702 than under Rule 41(g) that the defendant need not possess the monetary res."  Murphy, *supra*, at 151.

[6] The majority's year-specific approach leads it to conclude that some Tribes may be able to recover wrongfully withheld grant funds from 2008 because the district court ordered a portion of the 2008 NAHASDA funds to be set aside. *See* Maj. op. at 28 n.10. I agree.

- 11 -

years until fully expended.  Aplee. Br. at 73-78.  Distinguishing the time-limited appropriations in *City of Houston* and *County of Suffolk*, the Tribes argue that the relevant "res" is all NAHASDA appropriations because the funds remain available for the NAHASDA program until exhausted.  *Id.* at 78.

In response, the majority cites *City of Houston*, where the D.C. Circuit, after holding the relevant appropriation had lapsed and was fully obligated, rejected the City's attempt to look to *other* funds that it claimed were "no-year" appropriations.  Maj. op. at 32-33; *see City of Houston*, 24 F.3d at 1428.  The Tribes, however, do not seek to recover from other funds.  They wish to recover from the NAHASDA funds themselves.

\* \* \* \*

Under *Bowen*, the Tribes' suit is not for "money damages."  Section 702 applies because they are seeking specific relief—enforcement of the statutory mandate.  Sovereign immunity does not bar this suit.

Whether HUD had sufficient funds to satisfy the Tribes' claims is still an important question, but it has nothing to do with whether they are seeking "money damages" under § 702.  Rather, the source-of-funds issue concerns the availability of properly appropriated funds.

E.  **The Appropriations Clause**

Although sovereign immunity should not block the Tribes from seeking monetary relief for wrongfully withheld or retained NAHASDA funds, the Appropriations Clause may pose a separate problem.  The Constitution provides that money can be withdrawn from the Treasury pursuant only to a congressional appropriation.  *See* U.S. Const., art. I,

- 12 -

§ 9, cl. 7. As the Supreme Court has explained, the Appropriations Clause assures "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990). When Congress appropriates funds to an agency, the text of the appropriation limits the agency's discretion to spend. *See Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2194-95 (2012). As applied here, HUD can pay NAHASDA funds to the Tribes only to the extent Congress has authorized HUD to do so.

The district court resolved the sovereign immunity issue in the Tribes' favor and awarded "funds from all available sources." *See, e.g.*, Aplt. Addm. at A-1 (judgment for Fort Peck Housing Authority). It did not address the appropriations issue, which concerns what funds are "available."

The Tribes contend HUD has never argued that the Appropriations Clause constrains its ability to pay. *See* Aplee. Br. at 77. But HUD, although framing its position in terms of sovereign immunity, has said it "no longer has the funds" from the past grant years because they "have been fully obligated." Aplt. Br. at 66, 68. As discussed above, the availability of funds concerns the appropriations question, not sovereign immunity. The Tribes also contend remaining NAHASDA funds were available to satisfy their entitlement because past NAHASDA appropriations do not limit spending by year. If the Tribes are correct on that point, a dispute remains over whether there were sufficient funds to cover the Tribes' entitlements.

- 13 -

I would remand for the district court to analyze these appropriations questions.

F.  **Conclusion**

Section 702 has waived HUD's sovereign immunity.  The Tribes are not seeking money damages because they are seeking fulfillment of a specific statutory mandate.  But because the parties dispute whether Congress has appropriated funds that HUD could use to satisfy the Tribes' entitlements under NAHASDA and because the district court did not address the appropriations issue, I concur in the majority's decision to vacate the judgments.  I would, however, remand for further proceedings on the appropriations issue.

**Bacharach, J., concurring in part and dissenting in part.**

I join the majority's excellent opinion in Parts II(A) and (C). But in connection with Part II(B), I respectfully dissent. In my view, HUD enjoyed statutory authority to recoup overpayments under the block grants. Accordingly, I respectfully dissent from the majority's conclusion in Part II(B) that HUD lacked this authority.

\* \* \*

The Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA") authorizes a pool of funds for HUD to allocate among Native American tribes. In this case, HUD overpaid certain tribes and sought to recoup the overpayments through administrative offset.

The tribes contend that HUD lacked authority to recoup the overpayments. According to the tribes, agencies like HUD can exercise authority only upon a delegation from Congress. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The tribes acknowledge that "Congress empowered HUD to administratively recapture grant funds." Appellees' Resp. Br. at 19. The tribes argue, however, that this statutory power is limited to 25 U.S.C. §§ 4161 and 4165. And, as the majority explains, these provisions do not apply here.

HUD argues that it obtained authority to recoup the overpayments through NAHASDA, which implicitly incorporated the longstanding common-law principle that governmental entities can recoup erroneous payments. I agree with HUD. Through NAHASDA, Congress incorporated common-law principles that allowed HUD to recoup the overpayments by adjusting the tribes' annual allocations. Because the majority reaches a different conclusion, I respectfully dissent with regard to Part II(B) of the majority opinion.

**I.    There is a longstanding common-law principle that governmental entities can recoup overpayments by offsetting amounts otherwise owed to the recipients.**

In justifying the administrative offsets here, HUD relies on the common-law principle that governmental entities may recoup erroneous payments. Appellants' Opening Br. at 44 (citing *United States v. Wurts*, 303 U.S. 414, 415 (1938)). The Supreme Court recognized this principle in

*United States v. Wurts*, stating that the government can recoup overpayments through "appropriate action." 303 U.S. at 415.

As the tribes point out, *Wurts* involved a suit by the government to recoup its funds. *See id.* at 415-16 (noting that the government has a "long-established right to sue for money wrongfully or erroneously paid from the public treasury"). Thus, the tribes would limit the *Wurts* principle to situations involving suit brought by the federal government. *See* Appellees' Resp. Br. at 48 (arguing that the *Wurts* principle stands only for the proposition that the government may "bring a civil common law action in an Article III court to recover funds that were paid by 'mistake,' through the common law cause of 'unjust enrichment'").

The majority agrees with the tribes' interpretation of *Wurts*, concluding that the *Wurts* principle allows the government only "to *sue* to collect overpayments." *See* Maj. Op. at 21-22 (emphasis in majority opinion). The majority recognizes that in *Grand Trunk Western Railway Co. v. United States*, 252 U.S. 112, 117 (1920), and *United States v. Munsey Trust Co.*, 332 U.S. 234, 236 (1947), the Supreme Court allowed the recoupment of overpayments even without a suit. *See* Maj. Op. at 22-25. But, the majority attempts to distinguish *Grand Trunk* and *Munsey Trust* based on the fact that they involved governmental contracts with private parties, not administrative offsets, and did not involve a "unique trust responsibility." *Id*. at 23-25.

I respectfully disagree. *Wurts* did not have occasion to address the availability of common-law authority to recoup overpayments in the absence of suit. Thus, *Wurts* cannot be read as a limitation on this authority. *See Alwert v. Cox Comm'ns, Inc.*, 835 F.3d 1195, 1212 (10th Cir. 2016) ("An opinion is not binding precedent on an issue not addressed in the opinion."); *see also* Maj. Op. at 17 ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'" (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Indeed, *Wurts* relied on prior Supreme Court opinions stating that the government's common-law authority may come from either a suit or an offset. *Wurts*, 303 U.S. at 415 n.3, 416 n.4 (citing Supreme Court opinions).[7] And five federal appellate courts have interpreted *Wurts* to allow offset without the need for suit.[8] Until now, no circuit court has required the government to sue when invoking the common-law authority to recoup overpayments.

---

[7] *Grand Trunk W. R.R. Co. v. United States*, 252 U.S. 112, 121 (1920) ("[The government] was under no obligation to establish the illegality by suit. . . . [The government] was at liberty to deduct the amount of the overpayment from the monies otherwise payable to the company to which the overpayment had been made."); *Wis. Cent. R.R. Co. v. United States*, 164 U.S. 190, 211 (1896) ("If, in [the government's] judgment, money had been paid without authority of law, and [the government] has money of the recipient in [its] hands, [it] is not compelled to pay such money over, and sue to recover the illegal payments, but may hold it subject to the decision of the court when the claimant sues. And in that way multiplicity of suits and circuity of action are avoided." (citations omitted)).

[8] *See Bechtel v. Pension Benefit Guar. Corp.*, 781 F.2d 906, 906-07 (D.C. Cir. 1985) (per curiam) (holding that an agency could "adjust[] the levels of ongoing payments" to recoup overpayments because the *Wurts* principle indisputably authorized the agency to recoup funds); *Collins v. Donovan*, 661 F.2d 705, 708 (8th Cir. 1981) (holding that an agency could recoup erroneous overpayments under *Wurts* and that a regulation allowing for this recoupment "merely codifies the government's common law right to recover overpayments"); *Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 337 & n.10 (5th Cir. 1975) ("In some circumstances when government

- 17 -

The majority appears to recognize that suit is unnecessary when the government exercises its common-law authority to recoup overpayments from contractors. But a governmental contract is simply one of many situations in which the common law has recognized a right of offset without the need for a suit:

> The right of setoff is "inherent in the United States Government," and exists independent of any statutory grant of authority to the executive branch. The scope of this common law right is broad. Historically, it has been exercised against anyone who has a "claim" against the government, including unpaid government contractors, persons to whom the government owes retirement benefits, and employees to whom final salary payments or lump sum payments are due.

*United States v. Tafoya*, 803 F.2d 140, 141-42 (5th Cir. 1986) (citations omitted). Thus, four federal appellate courts have applied *Wurts* to allow administrative offsets even without the need for suit or the applicability of a government contract. *See Bechtel*, 781 F.2d at 906-07; *Collins*, 661 F.2d at 708; *Wilson Clinic & Hosp., Inc.*, 494 F.2d at 51-52; *DiSilvestro*, 405 F.2d at 153, 155.

As the majority points out, these opinions do not involve a "unique [trust] relationship." Maj. Op. at 24. But the majority does not

- explain why this difference creates a material distinction or

---

funds are improperly paid out the government has a claim enforceable either by direct suit *or by setoff . . . .*" (emphasis added) (citing *Wurts*)); *Wilson Clinic & Hosp., Inc. v. Blue Cross of S.C.*, 494 F.2d 50, 51-52 (4th Cir. 1974) (noting that an agency could "withh[o]ld the amount of alleged overpayments from later accruals" because "[i]t is underwritten by *United States v. Wurts* . . . that the Government may offset overpayments against current or subsequent obligations"); *DiSilvestro v. United States*, 405 F.2d 150, 153, 155 (2d Cir. 1968) (noting that an agency could "effect a set-off" to recoup erroneous payments because *Wurts* permits either setoff or a separate action).

- address the long line of authority allowing administrative offsets without the need for court action.

The majority points out that the government serves as a trustee for the tribes that are overpaid. But overpayments diminish the amounts available to other tribes, who are also beneficiaries of this trust relationship. The majority does not explain why the government's role as trustee would affect the widely recognized power to recoup overpayments.

The majority relies on an excerpt from a treatise by Richard Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy, and Practice*. This excerpt discusses authorization to recoup funds otherwise owed to the governmental entity making the grant. Richard B. Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy, and Practice* § 8:15, at 81 (1991 Cum. Supp.). But in the cited excerpt, Mr. Cappalli makes clear that even when trust relationships are involved, Congress implicitly delegates the power to administratively enforce grant programs notwithstanding the absence of an express statutory remedy:

> Although Congress has occasionally provided in express terms for the recovery of federal payments through deductions from subsequent payments or lawsuits, the existence of such authorizations should not be taken as evidence that Congress intended no recoveries in programs lacking them. It is equally probable that Congress was doing no more than making explicit an administrative enforcement right otherwise implicitly held. The correct analysis is that the statutory duty of federal agencies to administer assistance is necessarily accompanied by

the power to enforce conditions of aid through reasonable means.

*Id.* Mr. Cappalli's treatise does not suggest that a suit is needed when a governmental trustee seeks to offset funds that are otherwise owed, and the majority does not provide any other authority or reason to require suit when a governmental trustee seeks to recoup overpayments.

## II. NAHASDA authorizes HUD to recoup mistakenly distributed funds.

Congress implicitly delegated this common-law authority to HUD, authorizing it to recoup overpayments through offset. Indeed, in the absence of such a delegation, Congress would have left a gaping hole in NAHASDA by requiring HUD to allocate funds from a finite sum without any power to correct errors, leaving some tribes with too much and other tribes with too little.

In enacting NAHASDA, Congress presumably retained the common-law authority to recoup overpayments. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("'[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) (ellipsis in original))). Thus, Congress's silence on HUD's ability to recoup overpayments indicates an intent to adopt the common-law principle recognized in *Wurts*:

> Congress is understood to legislate against a background of common-law adjudicatory principles. Thus, where a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotation marks & citation omitted); *see* Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 50:1, at 143 (7th ed. 2012) ("All legislation is interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment.").[9]

If Congress had not intended to delegate this common-law power to HUD, a gap in NAHASDA would have allowed misallocations without any expressly created mechanism for correction. In my view, however, the mechanism for correction would have been implied.[10]

"[I]t is a fundamental principle of administrative law that the powers of an administrative agency are not limited to those expressly granted by the statutes, but include, also, all of the powers that may fairly be implied therefrom." *Morrow v. Clayton*, 326 F.2d 36, 43-44 (10th Cir. 1963); *see*

---

[9] This argument first appeared in HUD's reply brief, and we often decline to consider arguments newly raised in a reply brief. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). But HUD was responding to the tribes' argument that *Wurts* did not apply to an agency's effort to recoup overpayments. HUD's reply brief was a perfectly appropriate place to respond to the tribes' argument. *See Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003) (stating that we review issues newly raised in a reply brief when offered in response to an argument presented in the appellee's brief); *Sadeghi v. Immigration & Naturalization Serv.*, 40 F.3d 1139, 1143 (10th Cir. 1994) (considering an argument newly raised in a reply brief because it was responding to a contention in the appellee's brief).

[10] HUD did not make this argument. I discuss this scenario only to show what would have transpired if Congress had failed to delegate its common-law authority to recoup overpayments. *See* note 5, below.

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843, 844 (1984) ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit."). Through NAHASDA, Congress presumably delegated to HUD the powers fairly implied by the authorization to distribute funds among eligible tribes. These powers included authority to fill the gaps implicitly or explicitly created under NAHASDA:

> The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.

*Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Congress not only vested HUD with broad authority to administer NAHASDA, but also specifically authorized HUD to determine how much money each tribe would obtain. 25 U.S.C. § 4111(a); *see Kaw Nation v. Springer*, 341 F.3d 1186, 1187 (10th Cir. 2003) (stating that block grants under NAHASDA are controlled by HUD).

If we assume that NAHASDA had not implicitly incorporated the common-law right of offset, NAHASDA's express delegation of authority would have contained a sizeable gap. This gap would unleash a Pandora's Box of problems if either HUD or a tribe made a mistake leading to a tribe's underpayment or overpayment. For example, suppose that

- the Navajo Tribe accurately reports the number of eligible rent-to-own units and

- this report leads to an allocation of $100,000 for a given year.

Now, suppose that HUD accidentally adds a zero and sends the Navajo Tribe a check for $1,000,000 instead of $100,000. Or, suppose that the Navajo Tribe accidentally miscounts its eligible housing units, inadvertently increasing the tribe's annual allocation from $100,000 to $1,000,000. In either event, what would happen? Left uncorrected, the Navajo Tribe would obtain a windfall of $900,000 and this windfall would leave HUD $900,000 short when allocating the remaining funds among other tribes.

This would have resulted in a gap that had not been expressly addressed in NAHASDA. Presumably, Congress would not intend to allow such a mistake to go uncorrected. This presumption suggests that Congress implicitly delegated to HUD the authority to fill this statutory gap and correct misallocations based on mistakes by HUD or a given tribe. *See Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1281 (11th Cir. 2010) (stating that "Congress implicitly delegated common law authority" to the Secretary of Health and Human Services to recoup overpayments from Medicare Part B providers); *McNally v. United States*, 483 U.S. 350, 373 (1987) (Stevens, J., dissenting) ("The wide open spaces in statutes

such as these are most appropriately interpreted as implicit delegations of authority to the courts to fill in the gaps in the common-law tradition of case-by-case adjudication."); *see also* Martin H. Redish & Christopher R. Pudelski, *Legislative Deception, Separation of Powers, and the Democratic Process: Harnessing the Political Theory of United States v. Klein*, 100 Nw. U. L. Rev. 437, 439 (2006) (stating that Congress sometimes delegates "common-law-making power" to "agencies empowered to administer the statute").

The majority implies that this power to fill gaps would require HUD to adopt regulations when filling statutory gaps. But the tribes have not questioned the sufficiency of HUD's implementing regulations.[11]

\* \* \*

In summary, HUD has the authority to recoup the overpayments. This authority stems from the common-law principle allowing offset of overpayments. Without incorporation of this common-law principle, NAHASDA would have contained a wide gap. Even then, Congress would have intended for HUD to fill that gap.

---

[11]　　The majority states that I regard the tribes as waiving this argument. Maj. Op. at 25-26 n.9. I am not doing that. I am simply addressing the argument that the tribes made. The tribes argued that HUD lacked any statutory authority to recoup the overpayments. That is incorrect, for Congress delegated to HUD the common-law authority to offset funds owed to the government. I have simply pointed out that in the absence of that delegation of authority, NAHASDA would have contained a gap to be filled by HUD. The tribes have argued only that HUD lacked statutory authority, not that HUD failed to properly implement that authority by adopting regulations. *See* note 4, above.

The majority reaches a different conclusion based on factual differences between our case and some of the opinions cited by HUD. But even if those opinions are distinguishable, many others support HUD's reliance on the common-law principle allowing governmental entities to recoup overpayments through administrative offset. I would apply those opinions rather than stop the analysis based on factual distinctions with HUD's cited cases. Accordingly, I respectfully dissent from Part II(B) of the majority opinion.

*Modoc Lassen Indian Housing Authority, et al. v. United States Department of Housing and Urban Development, et al.*, Nos. 14-1313, 14-1331, 14-1338, 14-1340, 14-1343, 14-1407, 14-1484, and 15-1060.

**BACHARACH**, **J**., concurring in part and dissenting in part.

I join the majority's excellent opinion in Parts II(A) and (C). But in connection with Part II(B), I respectfully dissent. In my view, HUD enjoyed statutory authority to recoup overpayments under the block grants. Accordingly, I respectfully dissent from the majority's conclusion in Part II(B) that HUD lacked this authority.

\* \* \*

The Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA") authorizes a pool of funds for HUD to allocate among Native American tribes. In this case, HUD overpaid certain tribes and sought to recoup the overpayments through administrative offset.

The tribes contend that HUD lacked authority to recoup the overpayments. According to the tribes, agencies like HUD can exercise authority only upon a delegation from Congress. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The tribes acknowledge that "Congress empowered HUD to administratively recapture grant funds." Appellees' Resp. Br. at 19. The tribes argue, however, that this statutory power is limited to 25 U.S.C. §§ 4161 and 4165. And, as the majority explains, these provisions do not apply here.

HUD argues that it obtained authority to recoup the overpayments through NAHASDA, which implicitly incorporated the longstanding common-law principle that governmental entities can recoup erroneous payments. I agree with HUD. Through NAHASDA, Congress incorporated common-law principles that allowed HUD to recoup the overpayments by adjusting the tribes' annual allocations. Because the majority reaches a different conclusion, I respectfully dissent with regard to Part II(B) of the majority opinion.

I.  **There is a longstanding common-law principle that governmental entities can recoup overpayments by offsetting amounts otherwise owed to the recipients.**

In justifying the administrative offsets here, HUD relies on the common-law principle that governmental entities may recoup erroneous payments. Appellants' Opening Br. at 44 (citing *United States v. Wurts*, 303 U.S. 414, 415 (1938)). The Supreme Court recognized this principle in *United States v. Wurts*, stating that the government can recoup overpayments through "appropriate action." 303 U.S. at 415.

As the tribes point out, *Wurts* involved a suit by the government to recoup its funds. *See id.* at 415-16 (noting that the government has a "long-established right to sue for money wrongfully or erroneously paid from the public treasury"). Thus, the tribes would limit the *Wurts* principle to situations involving suit brought by the federal government. *See* Appellees' Resp. Br. at 48 (arguing that the *Wurts* principle stands only for the

2

proposition that the government may "bring a civil common law action in an Article III court to recover funds that were paid by 'mistake,' through the common law cause of 'unjust enrichment'").

The majority agrees with the tribes' interpretation of *Wurts*, concluding that the *Wurts* principle allows the government only "to *sue* to collect overpayments." *See* Maj. Op. at 21-22 (emphasis in majority opinion). The majority recognizes that in *Grand Trunk Western Railway Co. v. United States*, 252 U.S. 112, 117 (1920), and *United States v. Munsey Trust Co.*, 332 U.S. 234, 236 (1947), the Supreme Court allowed the recoupment of overpayments even without a suit. *See* Maj. Op. at 22-25. But, the majority attempts to distinguish *Grand Trunk* and *Munsey Trust* based on the fact that they involved governmental contracts with private parties, not administrative offsets, and did not involve a "unique trust responsibility." *Id*. at 23-25.

I respectfully disagree. *Wurts* did not have occasion to address the availability of common-law authority to recoup overpayments in the absence of suit. Thus, *Wurts* cannot be read as a limitation on this authority. *See Alwert v. Cox Comm'ns, Inc.*, 835 F.3d 1195, 1212 (10th Cir. 2016) ("An opinion is not binding precedent on an issue not addressed in the opinion."); *see also* Maj. Op. at 17 ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute

3

precedents.'" (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Indeed, *Wurts* relied on prior Supreme Court opinions stating that the government's common-law authority may come from either a suit or an offset. *Wurts*, 303 U.S. at 415 n.3, 416 n.4 (citing Supreme Court opinions).[1] And five federal appellate courts have interpreted *Wurts* to allow offset without the need for suit.[2] Until now, no circuit court has required the government to sue when invoking the common-law authority to recoup overpayments.

---

[1]    *Grand Trunk W. R.R. Co. v. United States*, 252 U.S. 112, 121 (1920) ("[The government] was under no obligation to establish the illegality by suit. . . . [The government] was at liberty to deduct the amount of the overpayment from the monies otherwise payable to the company to which the overpayment had been made."); *Wis. Cent. R.R. Co. v. United States*, 164 U.S. 190, 211 (1896) ("If, in [the government's] judgment, money had been paid without authority of law, and [the government] has money of the recipient in [its] hands, [it] is not compelled to pay such money over, and sue to recover the illegal payments, but may hold it subject to the decision of the court when the claimant sues. And in that way multiplicity of suits and circuity of action are avoided." (citations omitted)).

[2]    *See Bechtel v. Pension Benefit Guar. Corp.*, 781 F.2d 906, 906-07 (D.C. Cir. 1985) (per curiam) (holding that an agency could "adjust[] the levels of ongoing payments" to recoup overpayments because the *Wurts* principle indisputably authorized the agency to recoup funds); *Collins v. Donovan*, 661 F.2d 705, 708 (8th Cir. 1981) (holding that an agency could recoup erroneous overpayments under *Wurts* and that a regulation allowing for this recoupment "merely codifies the government's common law right to recover overpayments"); *Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 337 & n.10 (5th Cir. 1975) ("In some circumstances when government funds are improperly paid out the government has a claim enforceable either by direct suit *or by setoff* . . . ." (emphasis added) (citing *Wurts*)); *Wilson Clinic & Hosp., Inc. v. Blue Cross of S.C.*, 494 F.2d 50, 51-52 (4th Cir. 1974) (noting that an agency could "withh[o]ld the amount of alleged overpayments from later accruals" because "[i]t is underwritten by *United States v. Wurts* . . . that the

4

The majority appears to recognize that suit is unnecessary when the government exercises its common-law authority to recoup overpayments from contractors. But a governmental contract is simply one of many situations in which the common law has recognized a right of offset without the need for a suit:

> The right of setoff is "inherent in the United States Government," and exists independent of any statutory grant of authority to the executive branch. The scope of this common law right is broad. Historically, it has been exercised against anyone who has a "claim" against the government, including unpaid government contractors, persons to whom the government owes retirement benefits, and employees to whom final salary payments or lump sum payments are due.

*United States v. Tafoya*, 803 F.2d 140, 141-42 (5th Cir. 1986) (citations omitted). Thus, four federal appellate courts have applied *Wurts* to allow administrative offsets even without the need for suit or the applicability of a government contract. *See Bechtel*, 781 F.2d at 906-07; *Collins*, 661 F.2d at 708; *Wilson Clinic & Hosp., Inc.*, 494 F.2d at 51-52; *DiSilvestro*, 405 F.2d at 153, 155.

As the majority points out, these opinions do not involve a "unique [trust] relationship." Maj. Op. at 24. But the majority does not

- explain why this difference creates a material distinction or

Government may offset overpayments against current or subsequent obligations"); *DiSilvestro v. United States*, 405 F.2d 150, 153, 155 (2d Cir. 1968) (noting that an agency could "effect a set-off" to recoup erroneous payments because *Wurts* permits either setoff or a separate action).

5

- address the long line of authority allowing administrative offsets without the need for court action.

The majority points out that the government serves as a trustee for the tribes that are overpaid. But overpayments diminish the amounts available to other tribes, who are also beneficiaries of this trust relationship. The majority does not explain why the government's role as trustee would affect the widely recognized power to recoup overpayments.

The majority relies on an excerpt from a treatise by Richard Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy, and Practice*. This excerpt discusses authorization to recoup funds otherwise owed to the governmental entity making the grant. Richard B. Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy, and Practice* § 8:15, at 81 (1991 Cum. Supp.). But in the cited excerpt, Mr. Cappalli makes clear that even when trust relationships are involved, Congress implicitly delegates the power to administratively enforce grant programs notwithstanding the absence of an express statutory remedy:

> Although Congress has occasionally provided in express terms for the recovery of federal payments through deductions from subsequent payments or lawsuits, the existence of such authorizations should not be taken as evidence that Congress intended no recoveries in programs lacking them. It is equally probable that Congress was doing no more than making explicit an administrative enforcement right otherwise implicitly held. The correct analysis is that the statutory duty of federal agencies to administer assistance is necessarily accompanied by the power to enforce conditions of aid through reasonable means.

6

*Id.* Mr. Cappalli's treatise does not suggest that a suit is needed when a governmental trustee seeks to offset funds that are otherwise owed, and the majority does not provide any other authority or reason to require suit when a governmental trustee seeks to recoup overpayments.

## II. NAHASDA authorizes HUD to recoup mistakenly distributed funds.

Congress implicitly delegated this common-law authority to HUD, authorizing it to recoup overpayments through offset. Indeed, in the absence of such a delegation, Congress would have left a gaping hole in NAHASDA by requiring HUD to allocate funds from a finite sum without any power to correct errors, leaving some tribes with too much and other tribes with too little.

In enacting NAHASDA, Congress presumably retained the common-law authority to recoup overpayments. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("'[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) (ellipsis in original))). Thus, Congress's silence on HUD's ability to recoup overpayments indicates an intent to adopt the common-law principle recognized in *Wurts*:

> Congress is understood to legislate against a background of common-law adjudicatory principles. Thus, where a common-

7

law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotation marks & citation omitted); *see* Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 50:1, at 143 (7th ed. 2012) ("All legislation is interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment.").[3]

If Congress had not intended to delegate this common-law power to HUD, a gap in NAHASDA would have allowed misallocations without any expressly created mechanism for correction. In my view, however, the mechanism for correction would have been implied.[4]

---

[3]     This argument first appeared in HUD's reply brief, and we often decline to consider arguments newly raised in a reply brief. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). But HUD was responding to the tribes' argument that *Wurts* did not apply to an agency's effort to recoup overpayments. HUD's reply brief was a perfectly appropriate place to respond to the tribes' argument. *See Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003) (stating that we review issues newly raised in a reply brief when offered in response to an argument presented in the appellee's brief); *Sadeghi v. Immigration & Naturalization Serv.*, 40 F.3d 1139, 1143 (10th Cir. 1994) (considering an argument newly raised in a reply brief because it was responding to a contention in the appellee's brief).

[4]     HUD did not make this argument. I discuss this scenario only to show what would have transpired if Congress had failed to delegate its common-law authority to recoup overpayments. *See* note 5, below.

"[I]t is a fundamental principle of administrative law that the powers of an administrative agency are not limited to those expressly granted by the statutes, but include, also, all of the powers that may fairly be implied therefrom." *Morrow v. Clayton*, 326 F.2d 36, 43-44 (10th Cir. 1963); *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843, 844 (1984) ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit."). Through NAHASDA, Congress presumably delegated to HUD the powers fairly implied by the authorization to distribute funds among eligible tribes. These powers included authority to fill the gaps implicitly or explicitly created under NAHASDA:

> The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.

*Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Congress not only vested HUD with broad authority to administer NAHASDA, but also specifically authorized HUD to determine how much money each tribe would obtain. 25 U.S.C. § 4111(a); *see Kaw Nation v. Springer*, 341 F.3d 1186, 1187 (10th Cir. 2003) (stating that block grants under NAHASDA are controlled by HUD).

9

If we assume that NAHASDA had not implicitly incorporated the common-law right of offset, NAHASDA's express delegation of authority would have contained a sizeable gap. This gap would unleash a Pandora's Box of problems if either HUD or a tribe made a mistake leading to a tribe's underpayment or overpayment. For example, suppose that

- the Navajo Tribe accurately reports the number of eligible rent-to-own units and

- this report leads to an allocation of $100,000 for a given year.

Now, suppose that HUD accidentally adds a zero and sends the Navajo Tribe a check for $1,000,000 instead of $100,000. Or, suppose that the Navajo Tribe accidentally miscounts its eligible housing units, inadvertently increasing the tribe's annual allocation from $100,000 to $1,000,000. In either event, what would happen? Left uncorrected, the Navajo Tribe would obtain a windfall of $900,000 and this windfall would leave HUD $900,000 short when allocating the remaining funds among other tribes.

This would have resulted in a gap that had not been expressly addressed in NAHASDA. Presumably, Congress would not intend to allow such a mistake to go uncorrected. This presumption suggests that Congress implicitly delegated to HUD the authority to fill this statutory gap and correct misallocations based on mistakes by HUD or a given tribe. *See Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1281 (11th Cir.

2010) (stating that "Congress implicitly delegated common law authority" to the Secretary of Health and Human Services to recoup overpayments from Medicare Part B providers); *McNally v. United States*, 483 U.S. 350, 373 (1987) (Stevens, J., dissenting) ("The wide open spaces in statutes such as these are most appropriately interpreted as implicit delegations of authority to the courts to fill in the gaps in the common-law tradition of case-by-case adjudication."); *see also* Martin H. Redish & Christopher R. Pudelski, *Legislative Deception, Separation of Powers, and the Democratic Process: Harnessing the Political Theory of United States v. Klein*, 100 Nw. U. L. Rev. 437, 439 (2006) (stating that Congress sometimes delegates "common-law-making power" to "agencies empowered to administer the statute").

The majority implies that this power to fill gaps would require HUD to adopt regulations when filling statutory gaps. But the tribes have not questioned the sufficiency of HUD's implementing regulations.[5]

---

[5] The majority states that I regard the tribes as waiving this argument. Maj. Op. at 25-26 n.9. I am not doing that. I am simply addressing the argument that the tribes made. The tribes argued that HUD lacked any statutory authority to recoup the overpayments. That is incorrect, for Congress delegated to HUD the common-law authority to offset funds owed to the government. I have simply pointed out that in the absence of that delegation of authority, NAHASDA would have contained a gap to be filled by HUD. The tribes have argued only that HUD lacked statutory authority, not that HUD failed to properly implement that authority by adopting regulations. *See* note 4, above.

11

* * *

In summary, HUD has the authority to recoup the overpayments. This authority stems from the common-law principle allowing offset of overpayments. Without incorporation of this common-law principle, NAHASDA would have contained a wide gap. Even then, Congress would have intended for HUD to fill that gap.

The majority reaches a different conclusion based on factual differences between our case and some of the opinions cited by HUD. But even if those opinions are distinguishable, many others support HUD's reliance on the common-law principle allowing governmental entities to recoup overpayments through administrative offset. I would apply those opinions rather than stop the analysis based on factual distinctions with HUD's cited cases. Accordingly, I respectfully dissent from Part II(B) of the majority opinion.